And the court will proceed to the fifth case, Dhakal v. Sessions. Mr. Wong. Judge Flom, Judge Ripple, Judge Gettleman, good morning, well, good afternoon. May it please the court. I'm counsel for the plaintiff appellant. My client is lucky to be alive. He comes from Nepal, where the Maoists rule, and they beat him. They broke his leg to send him a message that if he didn't seize his human rights and democracy activities, they would kill him. He was lucky also that the Rhode Island University facilitated his flight to the United States, paid for his ticket, wrote him a letter so he could get a visa from the United States Embassy. And he's lucky also that he can appeal to this court. He's unlucky that the United States Citizenship and Immigration Services did not grant his asylum application, but he hopes that you will hear him and that you will reverse the decision of the court below. We believe that Ghoshani v. Nelson needs a revisiting, and we believe that because we believe that that decision focuses on cases in which asylum applicants have been placed in removal proceedings or deportation proceedings. We believe that because that decision focuses on those cases in which the district director or the asylum office has made a decision to deny, and the applicant is not in valid immigrant status, and those situations in which the applicant is not granted or denied asylum. The regulations order the asylum officer to do one of two things. Either grant the asylum application or refer the asylum application to the immigration judge in the case of that applicant who has not maintained legal status. In the case of that applicant who's maintaining legal immigration status, you do one of two things. You either grant it or deny it. Now, in Mr. DeKalb's case, because he is in temporary protected status, TPS, the asylum officer had the second option, grant the application or deny the application. He couldn't refer it to the immigration judge. And that is by regulation or statute? That is by regulation. I see. And because he could not refer it to the immigration judge, he had to deny it. And once he denied it, Mr. DeKalb had nothing to do after that. He didn't get review because he couldn't get referred to the immigration judge. You say he could, under the regulation, he could not have granted it? He could not have referred it to the immigration judge. I understand that, but could he have granted it? He could have granted it. I see. Because he was still in valid immigration status. So, in effect, what the director did was he said, I deny it. I can't refer it under the regulation for, I can't refer you for removal under the regulation because of this protected status you have. Is that right? That is correct, Judge. Okay. And under those circumstances, he can do one of two things. He can grant it. He can deny it because he's in temporary protected status. If he's not in legal immigration status and he's not under temporary protected status, he can then refer it to the immigration judge. And the difficulty for your client is that he, therefore, is denied if you want the collateral benefits of asylum, i.e. being able to bring other family members and what of his circumstances right now? Yes. He cannot bring his family to the United States. But he can stay? He can stay until his temporary protected status expires. And as I understand, that will probably happen in 2019, given the president's order. Is that right? That is going to end in June of 2019. And then he can contest the director's determination, right? If he is referred. If he is referred. But that's not necessarily going to happen because it is the choice that the Immigration and Customs Enforcement will make. There's been situations where they haven't made it. There's numerous cases in which people aren't qualified for cancellation of removal, for example, where ICE has elected not to commence removal proceedings. Could your client do that? Could your client commence removal proceedings? No, my client has not been placed in removal proceedings. No, could he do that? Can he commence removal proceedings? Okay, let's say June 2019 comes and goes. He's no longer in TPS. Could your client initiate the removal proceedings and get before an immigration? By himself? Yes. No, he couldn't. It's ICE who commences removal proceedings. Only they have the choice to do that. He can't do it independently. Are you arguing that the regulation that prevents the referral to removal proceedings is invalid? No, I'm not Is there discretion on the part of the director? I'm not arguing that. What is your theory? What I'm arguing is that Kashani is a case that controls in cases in which there is removal that is instituted, that there's a bar to taking review to district court. What we're arguing is that without that, a person like my client should be permitted to go to district court because he has no alternative for review. And that's why we went to district court because of removal proceedings. Because logically, my client is not under removal proceedings and Kashani does not say you're barred from immigration, you're barred from district court because of removal proceedings because there are no removal proceedings that are pending against my client. And if you get into, if I assume in the district court, your argument is what? That the director abused his discretion? By denying asylum. That the logic was flawed and the merits can be reached by the district court. In other words, that the district court can review the asylum application itself. The district court is capable of reviewing the application. Again, assuming arguendo that the district court would have authority to do that, would that be binding then on the service? In other words, if the protective status were later lifted, would your client be bound by the judgment of the district court from pursuing or from defending removal proceedings? If he's granted asylum, he's granted asylum. If the district court says no, then if TPS expires, he can be placed in removal proceedings. But he gets another crack at the apple? I imagine that would be true. But if the district court grants asylum, if the district court says no, he ends up here. He appeals to this court, which is where he would end up if the Board of Immigration Appeals said no. He would appeal to this court. It's not a second kick at the cat or a second bite at the apple, as Your Honor said. He would end up here on appeal. It's the same venue that he gets. Let me ask you a question about the prejudice. The prejudice that you say your client is being put into this limbo, in a sense, is that he can't bring his family over. If he were granted asylum, he would have a right to bring his family over. He's alleged, from what I read in the record, that his family has been threatened, right? That is correct, Your Honor. Okay, so why can't he bring his, if his wife came over today, she would be in TPS, would she not? Because Nepal is still in TPS. She would not be because she was not here by a certain date by which you needed to be here to qualify. I see, so, but could she come over and apply for asylum? She could. Okay, so for the same reasons that he's applying, that they've been persecuted because of their political activities by these Maoists, correct? That is correct, yes. So why can't he eliminate that prejudice by bringing them over and having them here and having them go through the asylum process just as he did? Well, because of logistics, he would need to actually get a way of bringing her into the country. You have to enter the country legally and I imagine Your Honor is not suggesting that he bring her into the country illegally. No, but as we've seen in other contexts, people are coming into the country and immediately putting themselves into the asylum process. I imagine that's possible. Theoretically, it is possible. To answer your question, yes, he could have come over with him too, right? Well, they only got one ticket from the University of Rhode Island. So it's a question of economics, basically. It was a question of economics and logistics. He was in hiding, he came from hiding. He was here legally for the university. That is correct, Your Honor. Okay. Okay, thank you, Mr. Wong. Mr. Press. Good afternoon. Joshua Press from the Department of Justice on behalf of the Federal Defendants. Your Honors, we understand this is a sympathetic case. I think a lot of immigration cases are that way, but our position is that Khashoggi was right more than three decades ago. It's still right today. It actually follows in line with this question from Mazgani v. INS, which was from 1971, and the same principles of rightness were affirmed as recently as 2000 by this court. It would be one thing if Khashoggi and the context in which that case was decided was some sort of aberration and has not been followed by other circuits, but in fact was followed two years later by the D.C. Circuit, by then Judge Ginsburg. It was followed by the Second Circuit in 1995. It was followed by the Fifth Circuit in 2000. That is a correct case, and the only after he had already received TPS, and that's just due to administrative backlog. We understand the position is somewhat unique, given that his TPS will expire a little over a year from now, but that does not mean that immigration law should rise or fall, given the unique circumstances that typically allow it. You're saying that he has to exhaust his administrative remedies regardless of the change in the whole procedure about, it used to be all in INS, now it's DHS and ICE. Yes. Okay, but I'm citing to a case, it's called Eder, I-D-D-I-R. Yes, I believe Judge Flom is very familiar with this. Okay, yes, Judge Flom, I think both of you. He wrote concurrence and then commented on it in Taylor v. McNamara. Well, in any event, that case says that exhaustion can be excused if there's an indefinite time frame for administrative action and the government acknowledges it has no idea, as in this case, if ever, when the INS, in this case, ICE, may institute removal proceedings. And isn't that exactly where we are today? No, that is not. Now, I think Your Honor is very familiar with the diversity visa context in which that case was decided. I think you specifically decided Pinescu v. INS a few years before that, which was discussed in Eder. The indefinite nature that was being discussed in the diversity visa context comes from how the petitioners in that case were essentially asking, we won the diversity visa lottery, when are we going to get our adjudication? They were essentially asking for mandamus relief. And because of the temporal limit of a year that was extremely important in that diversity visa context, the INS is constantly pushing that off, was having a great prejudicial effect immediately on those petitioners. In effect, it was saying, you are going to be out of status immediately because we are not going to do our job in adjudicating the petitions. That was the frustration you expressed with the INS in Pinescu a few years before that. That's what Judge Bauer was getting at with Eder. The problem with Eder was that it had already become moot. It was. As reflected by Judge Flaumann, as you can look at it from mootness in terms of the temporal aspect, I know that frustrated Your Honor in Pinescu, or you could look at it from a readjustability standpoint. Which is what this court did in Taylor v. MacCormick in December. That is an extremely distinguishable case given how the problem that the petitioner was complaining about was the indefinite nature of mandamus. When are you going to decide something that I submitted a year ago? We're not dealing with that here. There are clear deadlines that are already in place given that June 24th, 2019 is a date certain when certain, when Mr. DeCaul will be out of status. And there are things that he can do to follow up on USCIS's initial denial of his asylum application. For example, there have already been admitted changed country conditions which went into Secretary Nielsen's determination that TPS was no longer appropriate. He could perhaps use those in a renewed application with USCIS. USCIS will then make a determination on that. And if it's closer to the June 24th deadline, there shouldn't be any problem with him referring him to ICE for removal proceedings where he will get another bite at the apple to make the exact same asylum determination. However, he will have the additional benefit of developing a complete administrative record where he can call witnesses, where there can be cross-examination instead of the much more informal process that takes place with USCIS. That was the problem that this court confronted in Kashani, and exactly why this court said where there's further administrative action available, and it will be more complete. And not only will it be more complete, but it will provide the petitioner a complete avenue to judicial review through the normal claims channeling provision that I think at that point was in 1105. So you're saying he has additional administrative remedies within DHS? Absolutely. I mean, he can go back to USCIS. Must he wait until after June of 2019? No. He can certainly time this in a more appropriate way. I mean, obviously, the big frustration that he had, and I think is mentioned in his complaint, is that they took too long to decide. Well, if he has this pending application, that's not really an issue. Ultimately, he's asking for the district court to completely reweigh his asylum application. District courts are not in a good position to do that, which is why Congress has repeatedly passed legislation saying, no, we don't want it to go to the district court. We want those claims to be channeled through petitions for review to the circuit courts. What he's essentially asking for in that way would be to do an end run around the administrative process. That's why Khashoggi was followed by the Fifth Circuit in Cardozo, where they said, we're not going to let you do an end run, regardless of what's going on. I would point out that in Khashoggi, that the plaintiff in that case was not in unlawful status at the time. He was granted voluntary departure because his time as a student in this country had run out. Obviously, conditions in Iran had dramatically changed since he arrived in this country. But ultimately, he was given a month before any removal process could be initiated against him. He was given a month to voluntarily depart the country. If he did not voluntarily depart the country, at that point, INS could have initiated deportation proceedings against him. And he tried to effectively do the exact same thing that Mr. Takala is doing in this case. Go to the district court, do a complete reweighing of the evidence, have his asylum petition heard by the district court, and then basically moot out the administrative process that Congress put into place and the claim channeling that Congress wanted for those claims to go through the petition for review process. That's why this case is actually not a run-of-the-mill immigration case, and that's why this court's decision in Khashoggi is critically important to just the normal logistics of the administrative processing of asylum claims. If there are no further questions, the government would submit on this briefs. Thank you, Mr. President. Thank you. It expired? Your time has expired, but you may have two minutes. Do you agree that your client still has administrative remedies within DHS? I do not, Your Honor, and the reason is this. Mr. Press says he can refile. You can only refile if there has been change in country conditions, that is, conditions within the country. That has not happened. The conditions are still the same. You can have an option of refiling if there has been a change in personal circumstances. His circumstances have not changed. But they're saying that the decision to terminate the TPS with regard to Nepal reflects a change in the country that caused that termination. So doesn't that give your client an extra hook? That is not considered a change, and you can imagine what the chaos would be with all the countries that are being terminated from TPS at the moment by the Trump administration. That is not, and experts have determined that that is not a change in country conditions or change in personal circumstances. The other issue that Mr. Press has raised is the issue of Mr. Khashoggi being in the same situation as my client. Mr. Khashoggi was given 30 days to leave the country, and within those 30 days he decided to file his action. My client was not given 30 days to leave the country. There's a vast difference between those two situations. Thank you very much. Thank you, Senator. Thank you, Mr. Press. The case is taken under advisement, and the court will proceed to the 6th.